UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. CR-07-102-01 |
| v. | ) | |
| | ) | The Hon. Paul L. Friedman |
| KENNETH D. PHELPS, III | ) | |
| Defendant. | ) | Sentencing: October 23, 2007 |
| | ) | |

DEFENDANT'S MOTION WITH REGARD TO 18 U.S.C. § 3553(a) SENTENCING FACTORS AND MEMORANDUM IN AID OF SENTENCING

The defendant, Kenneth D. Phelps, III, through undersigned counsel, respectfully submits to the Court his position regarding the sentencing factors espoused in 18 U.S.C. § 3553(a). The Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005) and its progeny require district courts to consider all the factors contained in § 3553(a) when calculating a criminal defendant's ultimate sentence. This motion presents Mr. Phelps' position with regard to those factors contained in § 3553(a). In short, in light of Mr. Phelps' lack of criminal history, his long history of work to support his family, his service to his country, his early plea of guilty, his remorse, his depression, and the fact that he has not only lost his job but a promising career, we respectfully request the Court to sentence him to the lowest sentence sufficient to meet the goals of § 3553(a). *See United States v. Ferguson*, 456 F.3rd 660, 665 (6th Cir. 2006).

## INTRODUCTION

Kenneth Phelps stands before the Court for sentencing, having entered pleas of guilty to 12 counts of Wire Fraud and 12 counts of False Statements. He brings with him an immeasurable amount of regret, remorse, sorrow, humiliation and despair for his conduct in this case. To those who know Ken Phelps, it is inconceivable that he would stand accused of crimes

of this nature. Indeed, when the Court considers his upbringing, impressive background and actions in this case, it is quite clear that Ken Phelps is far from the typical criminal defendant.

We respectfully submit that Mr. Phelps' conduct in this case is inconsistent and inapposite to the type of person that he truly is. Nevertheless, Mr. Phelps' actions in this case were wrong and unjustifiable. In pleading guilty, Mr. Phelps has taken full responsibility for his actions and offers his sincere apology to the Court, his family, friends, and the community.

## PERSONAL BACKGROUND OF KEN PHELPS

### I. MR. PHELPS' UPBRINGING

Ken was born in April of 1969, at Davis Monthan Air Force Base in Tucson, Arizona to Kenneth David Phelps, Jr., a career Air Force officer, and Carmen M. Phelps, who was a stay at home mother. He has one brother, Robert Phelps, four years his senior, who currently serves in the U.S. Army.

As a military family, the Phelps moved frequently. When Ken was 3 or 4 years of age they moved to Vermont where Ken's father taught at a military college. They then moved to Omaha, Nebraska in 1976. A few years later Ken's father was reassigned to Washington, D.C.

Ken describes his family life as good. His father was and is a very stoic man, not necessarily a "touchy-feely" sort of person and not prone to express his emotions. But he loved his kids growing up and would spend time with them whether it was with sports or academics. He provided a safe and comfortable environment in which to grow up. Ken's mother was more of the nurturing type. Although sometimes showing her emotions to a fault, Ken believes it has made him a better person as he feels he can be more sensitive toward people.

Ken believes that the most unsettling event that ever occurred in their family was the divorce of his parents. To him it came out of nowhere so the surprise compounded the pain.

When his parents divorced, Ken and his brother were allowed to decide which parents they would live with and since his mother was moving to South Carolina to be close to friends he and his brother decided to stay with their father and continue to attend the schools in which they were enrolled. That lasted a year before they decided to move to South Carolina to be with their mother. Mr. Phelps and his brother were typical siblings growing up. As children they played constantly together and with neighborhood friends. As they got older, the age difference mostly kept them from associating with the same people. Although they argued and fought, they also shared a lot and loved each other. To this day they maintain a good relationship with each other, and the family remains close.

Mr. Phelps' family was shocked to hear that he had been arrested in this case. This matter has had a particularly devastating effect on those closest to him.

## II. MR. PHELPS' EDUCATIONAL BACKGROUND AND WORK HISTORY

School work came fairly easily to Ken in his early years, but beginning in Junior High School, his grades slipped somewhat and his interest in academics waned. Not so coincidentally this was about the same time Ken's parents divorced. Since his father was more the one to keep after the children with their grades, when they lived alone with their mother their grades slipped.

Although Ken certainly had the aptitude to grasp his schoolwork, he became somewhat disinterested in school and would just do what he needed to do to pass. This was in stark contrast from his earlier years where he was put in accelerated reading classes and was often noted for creativity. In high school he often found when reading passages of an assignment that he would look at every word of every page but not read anything. His eyes would go over everything, he would turn page after page, but his mind was entirely somewhere else. He never understood why this happened until later in life and just attributed it to daydreaming.

When his senior year of high school came, Ken needed to make a decision about what he wanted to do. College was not an option as he had not taken his SATs and never applied to college. Ken ended up talking to a military recruiter and decided that the military was going to be the best course for him. It would provide him with a steady job, training, educational benefits and health coverage.

Ken scored extremely well on his entrance exams into the military. His scores were so good that he was able to get into his first occupational choice, an Air Traffic Controller.

In August of 1987, Ken entered into Basic Military Training in San Antonio, Texas. Following that, Ken was sent to Biloxi, Mississippi for four months of Air Traffic Control training. This was an intensive school but one in which he excelled. He graduated from the school in March of 1988, and then flew home and was married two days later to his high school sweetheart. He and his wife then left for his first duty assignment at Pease AFB in Portsmouth, New Hampshire.

The training to become a fully qualified controller took about a year. Ken applied himself, worked very hard and was able to complete it in about 10 months. The stresses of the job were extreme but he loved it. He was nominated and selected as Air Traffic Controller of the Quarter a number of times as well as Airmen of the Quarter in his squadron.

Ken began taking college courses on the base and after a few months met with career counselors on base. They were impressed with both his professional and academic achievements and recommended that he pursue a career in the Air Force as an officer and to apply to the ROTC detachment at the University of New Hampshire to seek a commission. He received stellar recommendations from his squadron commander and other supervisors to the detachment.

Ken decided to become an Air Force pilot. Flying had always been a passion of his and to have the opportunity to do it as a career for the military was beyond belief. For him it was a dream came true. The ROTC detachment believed that his scores were so good that he would have no problem obtaining a pilot slot when his application package was sent before the selection board at Headquarters ROTC. However, shortly before his package was to be sent before the board, Congress and the President began making severe cuts in military spending. This affected not only training but also the number of pilots they would keep actively flying. Since there were so many pilot trainees in the pipeline, they had to cut 500 pilot slots from people who were already selected or in the program. Ken's application package was thus never submitted. He was offered to submit his package with another career choice, but decided that as an Air Traffic Controller, he had the second best job in the Air Force.

Nonetheless, Ken found this to be a sharp blow to his psyche. He went into a bit of a depressed state. He was, at the time, taking flying lessons at a local airport to obtain his private pilots license. After the loss of the ROTC slot, he stopped taking flying lessons. Shortly after, he discontinued taking college courses. He and his wife found themselves having difficulties in their marriage to the point where they separated for a brief period of time.

Shortly thereafter it was announced that Pease AFB had been selected by the Base Realignment Commission to be closed. Ken was offered the choice of separating from the Air Force earlier than his four year enlistment, or extending his enlistment and taking another assignment. The year was 1990, and U.S. troops were just beginning to deploy to Saudi Arabia for Desert Shield. He elected to stay in the military and volunteered to be deployed overseas by taking an assignment with a combat communications unit based in Florida.

He was deployed to Kuwait from August 1990 until March 1993, where he was awarded medals, service awards and service ribbons.

Upon returning to North Carolina from Saudi Arabia, Ken began working regularly as an Air Traffic Controller and also taking college courses again. In August of 1992, his home unit in Florida recalled him and he deployed to Homestead AFB, Florida following its destruction from Hurricane Andrew. When he returned from Florida, he had to make a decision as to whether he would re-enlist or separate from the military since the end of his enlistment was approaching.

He began by applying to the Federal Aviation Administration to work as a civilian air traffic controller. Unfortunately, he could not even schedule a testing date as the FAA had a hiring freeze for controllers. This was yet another in a series of disappointments for Ken. The fact that he was not going to be able to get into the FAA due to a hiring freeze was demoralizing. He decided that although he loved his job as a controller, he did not want to stay in North Carolina so he elected to separate from the military. Prior to his separation, he applied to Mary Washington College in Fredericksburg, Virginia and was accepted for the fall semester.

When he returned to Virginia he took a summer job working with the U.S. Department of Justice as an in-house courier. His wife had left North Carolina early to find employment and was becoming established in her job. They bought their first home in Stafford, Virginia and shortly after he began fall classes at Mary Washington.

Ken was pursuing a general liberal arts degree through a program for continuing education students. He became very interested in politics so his intent was to concentrate a lot of his studies in this area. He began attending the College Republican meetings on campus and soon found himself being elected as its President.

The contacts he made as President of the College Republicans helped Ken obtain a job at Baker and Botts and thereafter with numerous political candidates in Virginia. After several campaigns Ken left the political world and began working administrative jobs through a temporary agency. In March of 1996, his son, Connor, was born. His wife stayed home the first three months with him and since Ken was only working a temporary job, he stayed home the next couple months. Eventually Ken landed a job with Lockheed Martin at their Washington office in Crystal City. He was assisting the new PAC manager there who was trying to straighten out their PAC records as well as implement a new software system that would streamline their PAC's operations.

Ken worked at Lockheed Martin for a number of months but was recruited by and eventually hired to be a field coordinator by Jerry Kilgore who was running for Attorney General in Virginia.

He left Lockheed Martin to begin working on the campaign, but two weeks later, his former boss at Lockheed asked if he would be interested in her job as the PAC Manager. He accepted and left the campaign. Eventually Ken was hired on a permanent employee but at a significantly lower salary than the previous person in this position. While he enjoyed the work that he did and the people he worked with, and even though he received raises and promotions over the years, by starting at such a mediocre pay level, it was always difficult financially. He made about one half the salary of most of the other professionals who were close to his age. It was during this time that Mr. Phelps began to write checks to himself. (The reasons and surrounding circumstances will be discussed *infra.*)

After being caught writing checks to himself and leaving Lockheed, Ken did not work for nearly a year and a half. He was in a deep state of depression and basically stayed in his house.

He eventually got a job bartending at Cheeseburger in Paradise. His managing partner asked him to consider going into their management program but since he needed every other weekend off for visitation with his children, the hours of a restaurant manager were not workable. They then asked him to become a part time Key, which is a front of house manager, but without the opening and closing responsibilities.

Concurrently with working at Cheeseburger, Ken obtained his Virginia Real Estate license. After passing the state and national exam, he waited about six months before signing on with Jobin Realty. As a new agent, this was not the best move on his part. It was a relatively small firm with minimal training offered. He spent about six months associated with that firm before transferring to Weichert Realtors. Although the commission rate was lower for agents than at Jobin, Weichert was a much larger company that offered a significant amount of training and mentorship.

The problem Ken encountered with real estate was the start-up costs with establishing his own business. There were numerous association fees, memberships, supplies, advertising costs and other miscellaneous expenses that all needed to be paid for on the front end. Without selling any homes or having any listings, these fees all needed to come out of pocket. Since he was only working as a bartender and had child support obligations, he found it untenable. Ken eventually stopped working there due to the fact that he could not afford it. The real estate market in the area had steeply declined so the chances that he would have any clients in the near term were slim. Nonetheless Ken remains employed at Cheeseburger in Paradise where he is described as an extraordinary employee who is a huge asset to the company.

## III. MR. PHELPS' FAMILY LIFE

As we mentioned earlier, Mr. Phelps, at age 18, married his childhood sweetheart. Although they recognized at the time that they were very young to get married, they refused to believe they could not overcome the inevitable obstacles they would encounter.

After seven years of marriage they were close to separating and divorcing. They decided to attempt to work out the differences and begin a family. Their first child, Connor, was born in March of 1996. It was a trying experience for both with a new child, a mortgage, two car payments and not a lot of income. After Mr. Phelps was hired by Lockheed Martin on a full time basis, their second child, Lauren, was born in August of 1997. Not long thereafter a third, and totally unexpected child, Madison, was born. This brought quite a bit of stress as they had just moved into a slightly larger house to accommodate the other two children and felt that they had finished having children. Within two months of Madison being born, Ms. Phelps informed Ken that she did not wish to continue with the marriage. She mainly complained that Mr. Phelps did not make enough money to support them in the manner she wished for them to be supported, and cited one failure after another that Ken had endured along the years. Ken was shocked and devastated. His whole world had been pulled out from under him. He felt he had lost everything - his marriage, his children and his home. He moved into his mother's house and placed all of his personal belongings into storage. He was financially strapped and was soon paying nearly $2,000.00 per month in child support.

Through all this, Mr. Phelps believes that his relationship with his children is solid. To him they are the most wonderful and most important things in his life. After what seems to Ken like a lifetime of disappointments and failures he believes they are the one thing he did right. In

a letter written to this counsel Ken discusses his children by stating: "they bring me such happiness when I'm around and I love to talk to them to find out what and how they're doing in school. Connor is a very athletic boy who plays baseball, football and basketball. He is also quite talented academically. He is in accelerated classes and his teachers have approached us previously about moving him ahead a year in school. My two daughters are the most beautiful girls I've ever laid eyes upon. My older daughter is a caring, kind and considerate person. My youngest is turning out to be a female version of my son, very athletic and very smart. While they bring so much joy and happiness to my life it is bittersweet. I miss not being able to see them grow each and every day. I miss not being able to sit around the dinner table at night and find out each and everything that happened to them that day. I miss not being able to take them to sports practices or help them with homework after school. I miss not having the teaching moments with them… those seemingly unremarkable times when you impart something to your children that they keep with them forever."

The love that Ken Phelps has for his children runs deep and the circumstances in which he now finds himself has plunged him deeper into the depression that he has suffered for years. Even though his wife remarried, Mr. Phelps was responsible for child support payments. Those payments were based upon his salary while at Lockheed Martin and working as a bartender he was unable to make those payments. He fell into arrears and not only conceded custody of his children to his wife and her new husband, but watched as the new husband officially had the children's last name changed to his own. Mr. Phelps describes this as one of the most painful things he has ever had to endure because he knows that he now has no say in their lives and feels like he has been pushed to the periphery.

ARGUMENT

In determining Mr. Phelps' sentence, this court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as the need for the sentence imposed to (1) "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (2) "afford adequate deterrence to criminal conduct" and (3) "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(a)(2)(C). In support of his argument with regard to the relevant considerations, Mr. Phelps offers the following.

I. NATURE AND CIRCUMSTANCES OF THE OFFENSE

The presentence report prepared by Renee Moses-Gregory, as well as the Indictment filed by the Government, describes the criminal activity of Mr. Phelps. On its face, it would appear that Mr. Phelps engaged in a much more elaborate scheme than what was really present. A short and not so sweet version of events is very simple. Mr. Phelps, in an effort to dig out of the financial hole he was in, and in an effort, he believed, to save his struggling marriage, wrote check after check to himself. While he changed the computer notations at Lockheed Martin to disguise that he was the payee of the checks, he knew that it was only a matter of time before he would be discovered because he knew that Lockheed's PAC was required to make periodic reports to the Federal Election Commission concerning each and every contribution made to a federal political candidate or campaign.

Many around Mr. Phelps now believe that he actually wanted to be caught. He was in a deep state of depression and seemingly had nowhere to turn. As wrong and as illegal as Mr. Phelps' actions were, it would appear from his job performance ratings, those who knew him,

and those who worked with him, that his actions did not detract from the stellar work performance he exhibited.

In considering the "nature and circumstances of the offense" under § 3553(a)(1), we urge the Court to recognize the offense for what it truly was. It was wrong. It was illegal. It was the result of a man writing checks to himself, thinking in his depressed state, that it might somehow help keep his family together.

II. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

We realize that we have presented a fairly elaborate history of Mr. Phelps. This 38 year old offender, aside from a driving under the influence charge, has had a clean record. He has worked hard and tried to support a family. He served his country, and was awarded numerous medals and ribbons for distinguished service during both Operation Desert Shield and Desert Storm, where he was deployed as an air traffic controller in combat.

To Mr. Phelps' credit, he has been able to function in life even though it appears from discussions with his family members and recently with doctors who have treated him, that he has not only suffered from depression for quite some time but he also suffered from attention deficit disorder since an early age. Mr. Phelps describes his ADD/Depression as follows:

> When my wife and I split up, I tried to convince her to come with me to the clinic for marriage counseling but she refused. I continued to see Vaughn [his therapist] for therapy. Through tests I took at the clinic, I learned that I have a very strong case of ADD. I had suspected this a few months earlier and purchased a book entitled Driven to Distraction. I cried when I read the book because it made me realize what was going on with me my entire life. Why I had difficulty staying focused in school and thus was a mediocre student. Why I could not finish projects, why I procrastinated as badly as I did. Why I had so many problems in relationships. Why I felt depressed because of these things.
>
> At the clinic they prescribed me not only anti-depressants, but also Ritalin for the ADD. The Ritalin was amazing. It helped me focus

> like a laser beam and think clearly for the first time in dozens of years. Unfortunately after losing my medical benefits when I left Lockheed Martin, I have been uninsured and unable to continue my therapy and get coverage for the prescriptions that I believe were very helpful.
>
> Since I left Lockheed Martin and went into a deeper depression, I have found myself drinking quite a bit more. Not necessarily to excess, but certainly more frequently. I believe this has been more of a self-medication attempt. I likely use the alcohol to relieve the stress of the situation that I'm in currently. I received a DUI last year and have since not driven. I should have received a restricted license but have not done anything to pursue it.
>
> I really feel like my life is in a horrible place at this point. Where once I felt that there was promise and a good future ahead of me, I now feel that I am only treading water. I have never really felt suicidal but there is not much in my life that I have to look forward to. I am scared about what the future holds in this case and petrified to the point of inaction.

There is no question that Mr. Phelps' conduct in this case has been brought on by his marital problems, depression and erroneous belief that money could solve his problems. Mr. Phelps can become, once again, a productive member of our community if he can receive proper counseling. As the Court can see from Mr. Phelps' own statements he has been devastated by these charges and is trying desperately to right the wrong that he has caused.

## III. THE NEED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

Again, we submit that Mr. Phelps' long history of employment, devotion to family, lack of criminal history, along with the fact that he admitted his guilt early on, has had to resign from his job, forfeited his leave to assist in restitution, will suffer the consequences of being a convicted felon, will have to continue to work for many years to make restitution, are all sufficient punishment to reflect the seriousness of his involvement in this offense and to promote

respect for the law. We respectfully submit that a lengthy period of incarceration is not necessary to satisfy any of the objectives of § 3553.

IV. THE NEED TO AFFORD ADEQUATE DETTERRENCE TO CRIMINAL CONDUCT

We submit the same factors listed above to promote respect of the law and to provide just punishment also afford adequate deterrence to criminal conduct. Clearly Mr. Phelps has been deterred. The shame and humiliation he feels, even if there were no other consequences, would serve to deter him. A felony conviction, loss of his job and all the matters associated with his job, such as health insurance, pension, etc., and overall public humiliation are enough, given the facts of this case, to deter criminal conduct by others. In fact, most people in a situation such as Mr. Phelps will be more deterred by the fact of being caught and publicly "hung out to dry" than by the prospect of spending a couple of years in jail.

V. THE NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES

There can be no real dispute that there is no need for a lengthy period of incarceration in this case to protect the public from future crimes by Mr. Phelps. Mr. Phelps arrest and his involvement in the criminal justice system, along with the loss of job, felony conviction and attendant consequences, is more than sufficient to ensure that Mr. Phelps will never again make a bad decision with respect to any illegal conduct. This has been a hard learned lesson for Mr. Phelps. The public needs no protection from him. Since his arrest, he has cooperated with the government in every aspect, and been truthful with government agents and the probation office.

CONCLUSION

The advisory sentencing guideline range in this case, based on a criminal history I, with a total offense level of 16, is a range of imprisonment of 21 to 27 months. We respectfully submit

that a sentence within this range is simply not warranted for this offender and this case. Mr. Phelps has been broken, beaten and battered. At almost every turn of his life he has met with misfortune. Yet, through it all, he has continued in his attempts to work hard and provide for his family. Battling through attention deficit disorder, undiagnosed for many years, and severe bouts of depression, still has been able to serve his country and be recognized as an exemplary employee whether working at a white collar job or flipping hamburgers.

Ken Phelps is truly regretful of his actions. He is remorseful and he is sorry and he suffers humiliation and despair knowing that he has let down his family and his friends but more than all of this Ken Phelps knows that in one way or another his actions have caused him to not only lose his children but to have had his very name stricken from them.

If the Court feels that the crime simply must be punished then we urge the Court to order 12 months of home detention during which time Mr. Phelps can begin to make restitution and, through the Probation Office, begin treatment for his mental problems. We also urge the Court to consider a large number of hours of community service. This crime was not a crime driven by greed, it was a crime of desperation by a man clearly not thinking of the consequences to himself, but simply willing to risk all to keep his family together. We urge the Court to find a solution short of incarceration in a federal prison as a just resolution in this case.

Respectfully submitted,

_______/s/_________________________

G. ALLEN DALE
Bar No. 954 537
601 Pennsylvania Avenue, N.W.
North Building - 9th Floor
Washington, D.C. 20004-2601
(202) 638-2900
Facsimile: (202) 783-1654

# EXHIBIT 1

September 1, 2007

The Honorable Paul L. Friedman
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
Room 6012
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Friedman,

My name is Carmen Wilson. Ken Phelps' mother. The purpose of this letter is to convey the wonderful person my son is. To his children, he is a great father. He has a fantastic relationship with them. He loves to go to their games. He is a great son, always concerned with my life, and my well being. Other family members are proud of all his accomplishments in his life. All his cousins look up to him.

Ken was well disciplined growing up. His father was in the Air Force and retired at the rank of Colonel after 22 years. As a young boy he served in our church as an Alter boy. Both he and his brother were in Cub Scouts and then Boy Scouts.

At the age of 16, we moved to Woodbridge, Virginia where he attended and graduated from Woodbridge Senior High School. After graduating, he joined the Air Force and serving five years as an Air Traffic Controller. This included a deployment to Saudi Arabia during Operations Desert Shield/Desert Storm.

I must admit I am very proud of my son for serving our country. His brother is also currently serving in the United States Army and will be deployed to Iraq in the coming months. I am a very proud mother.

After his service in the Air Force, Ken attended Mary Washington College where he pursued an education in Political Science. Through his contacts made working with various state legislators, he was hired as a campaign manger for a House of Delegates race in Roanoke, Virginia.

In 1996, Ken joined Lockheed Martin where he had high goals for himself. While at Lockheed, he went through a divorce, which affected him very much and put him into depression.

Ken's children come over to see him every other weekend. Their visits to our house and the time spends with them give him great pleasure. He loves nothing more in this world than his children.

I know Ken wants his life to go back to normal and live a productive life. I pray to God that he is given a chance to do so. I respectfully ask for your leniency in this matter so that Ken may begin to move forward in his life. Thank you very much for taking the time to read this letter.

Respectfully yours,

Carmen M. Wilson

*Lic. Rafael Avilés Cordero*
Abogado-Notario

September 6, 2007

TO THE HONORABLE JUDGE:

IN RE: Kenneth Phelps

It is very hard to express a message which will be read by an unknown, especially if you hope that this person will not consider the thoughts as a desire, but as desperate petition of members of a family that are going through a very painful situation.

My name is Rafael Aviles, an active member of the Puerto Rico Bar Association and uncle of Kenny, as we call him.

I know Kenny since he was born and through his 40 years of age we have kept a very close relation which allows me to express my opinion about him as a son, as a father, as a friend and as one of my best nephews. He was raised in a home where moral, religious and ethics principles where taught to him and he still observes them.
I am sure and I know that despite the situation where he finds himself, he still keeps and observes these principles. I say this because I believe that it had to be a very desperate and dramatic situation that lead him to make the mistake or wrongful action which is now before your consideration.

I have been a in touch with him very frequently during the past months and I can tell that the entire judicial process has been his worst experience in his life, his worst punishment. I have seen tears in his eyes, moments of anguish and desperation that even made us meditate about the importance of the family, friends and God's support, as our most important guidelines in our lives. I know that only this has Kenny still standing in his feet.

I can assure you, Your Honor, that Kenny is an extraordinary human being, which makes me beg for your mercy when making the final decision in this case.

He will not loose the opportunity to continue his life as an excellent member of the society where he lives and time will prove that my words are genuine and truthful.

My respects for you.

Rafael Aviles Cordero, esq.

Apartado 93, Camuy, Puerto Rico, 00627/ Teléfono: (787)817-0415

September 11, 2007

Honorable Judge,

My name is Hector Hernandez; I am an elementary ESOL teacher that works with students who are learning the English language at Marumsco Hills Elementary School in Woodbridge, Va. Kenneth Phelps is my nephew. As long as I can remember, my family and I have always known Ken as a wonderful person that was constantly achieving things in life that would lead him to a promising future. As a young boy, he played various sports like soccer, baseball and golf. My two sons have always looked up to him because of the way he acted and spoke to them. I've seen in Ken a person that is courteous, kind, generous and intelligent. My wife and I feel good about our children having him as a role model. I moved to Virginia three years ago and when I arrived, he and his mother where the ones who helped me settle in. Ken helped me in so many ways, for example, he would take me to job interviews and wait sometimes for hours then bring me back home. I will be forever thankful to him for his unconditional help. I have been teaching here in Virginia for more than three years now and I owe that in some way to him. Ken is a loving father of three beautiful children which he adores. He cherishes the time they spend together at home, at games and at the park. I enjoy seeing them together because they love each other so much. Despite of Ken's bad decisions, he is a wonderful son, father and nephew. I know that he is very sorry for his actions and has been through difficult times because of this. My only wish is that it be taken under consideration that Ken is a great citizen that needs a chance to get back on track again. I firmly believe that God has a wonderful future for him because of the kind of person he is.

Respectfully Yours,

Hector Hernandez
14907 Cordell Ave.
Woodbridge, Va 22193
(703) 730-9703

September 8, 2007

Your Honor,

Respectfully I am taking the liberty of writing this letter to you. I am Kenneth Phelps youngest aunt, Ana Aviles. I lived in Puerto Rico for almost my entire life and I have always been in contact with him. I've been living in Virginia for 3 years, and my relationship with Ken is closer now. I have known Ken since he was born and ever since he was a young boy, he would always visit us. My mother, (his grandmother) was very proud of him because he was a loving grandson to her and got along with everybody. Ken, the person that I know, is a very polite and careing person. Now that I live in Viriginia, I can see that he is the same kind of person. My family and I like to spend time with him, his children and my sister (his mom). We enjoy going to places together as a family. I know Ken is going thru a rough time, and so are we. Ken just needs an opportunity to be able to have a fresh start. I always pray to God that this will come true because he needs it. I ask of you to give him this opportunity so he could start a new life.

Sincerely Yours,

Ana Aviles
Woobridge, VA
Tel. 703-600-9295

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. CR-07-102-01 |
| v. | ) | |
| | ) | The Hon. Paul L. Friedman |
| KENNETH D. PHELPS, III | ) | |
| Defendant. | ) | Sentencing: October 23, 2007 |
| | ) | |

DEFENDANT'S MOTION WITH REGARD TO 18 U.S.C. § 3553(a)
SENTENCING FACTORS AND MEMORANDUM IN AID OF SENTENCING

The defendant, Kenneth D. Phelps, III, through undersigned counsel, respectfully submits to the Court his position regarding the sentencing factors espoused in 18 U.S.C. § 3553(a). The Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005) and its progeny require district courts to consider all the factors contained in § 3553(a) when calculating a criminal defendant's ultimate sentence. This motion presents Mr. Phelps' position with regard to those factors contained in § 3553(a). In short, in light of Mr. Phelps' lack of criminal history, his long history of work to support his family, his service to his country, his early plea of guilty, his remorse, his depression, and the fact that he has not only lost his job but a promising career, we respectfully request the Court to sentence him to the lowest sentence sufficient to meet the goals of § 3553(a). *See United States v. Ferguson*, 456 F.3rd 660, 665 (6th Cir. 2006).

INTRODUCTION

Kenneth Phelps stands before the Court for sentencing, having entered pleas of guilty to 12 counts of Wire Fraud and 12 counts of False Statements. He brings with him an immeasurable amount of regret, remorse, sorrow, humiliation and despair for his conduct in this case. To those who know Ken Phelps, it is inconceivable that he would stand accused of crimes

of this nature. Indeed, when the Court considers his upbringing, impressive background and actions in this case, it is quite clear that Ken Phelps is far from the typical criminal defendant.

We respectfully submit that Mr. Phelps' conduct in this case is inconsistent and inapposite to the type of person that he truly is. Nevertheless, Mr. Phelps' actions in this case were wrong and unjustifiable. In pleading guilty, Mr. Phelps has taken full responsibility for his actions and offers his sincere apology to the Court, his family, friends, and the community.

## PERSONAL BACKGROUND OF KEN PHELPS

### I. MR. PHELPS' UPBRINGING

Ken was born in April of 1969, at Davis Monthan Air Force Base in Tucson, Arizona to Kenneth David Phelps, Jr., a career Air Force officer, and Carmen M. Phelps, who was a stay at home mother. He has one brother, Robert Phelps, four years his senior, who currently serves in the U.S. Army.

As a military family, the Phelps moved frequently. When Ken was 3 or 4 years of age they moved to Vermont where Ken's father taught at a military college. They then moved to Omaha, Nebraska in 1976. A few years later Ken's father was reassigned to Washington, D.C.

Ken describes his family life as good. His father was and is a very stoic man, not necessarily a "touchy-feely" sort of person and not prone to express his emotions. But he loved his kids growing up and would spend time with them whether it was with sports or academics. He provided a safe and comfortable environment in which to grow up. Ken's mother was more of the nurturing type. Although sometimes showing her emotions to a fault, Ken believes it has made him a better person as he feels he can be more sensitive toward people.

Ken believes that the most unsettling event that ever occurred in their family was the divorce of his parents. To him it came out of nowhere so the surprise compounded the pain.

When his parents divorced, Ken and his brother were allowed to decide which parents they would live with and since his mother was moving to South Carolina to be close to friends he and his brother decided to stay with their father and continue to attend the schools in which they were enrolled. That lasted a year before they decided to move to South Carolina to be with their mother. Mr. Phelps and his brother were typical siblings growing up. As children they played constantly together and with neighborhood friends. As they got older, the age difference mostly kept them from associating with the same people. Although they argued and fought, they also shared a lot and loved each other. To this day they maintain a good relationship with each other, and the family remains close.

Mr. Phelps' family was shocked to hear that he had been arrested in this case. This matter has had a particularly devastating effect on those closest to him.

II. MR. PHELPS' EDUCATIONAL BACKGROUND AND WORK HISTORY

School work came fairly easily to Ken in his early years, but beginning in Junior High School, his grades slipped somewhat and his interest in academics waned. Not so coincidentally this was about the same time Ken's parents divorced. Since his father was more the one to keep after the children with their grades, when they lived alone with their mother their grades slipped.

Although Ken certainly had the aptitude to grasp his schoolwork, he became somewhat disinterested in school and would just do what he needed to do to pass. This was in stark contrast from his earlier years where he was put in accelerated reading classes and was often noted for creativity. In high school he often found when reading passages of an assignment that he would look at every word of every page but not read anything. His eyes would go over everything, he would turn page after page, but his mind was entirely somewhere else. He never understood why this happened until later in life and just attributed it to daydreaming.

When his senior year of high school came, Ken needed to make a decision about what he wanted to do. College was not an option as he had not taken his SATs and never applied to college. Ken ended up talking to a military recruiter and decided that the military was going to be the best course for him. It would provide him with a steady job, training, educational benefits and health coverage.

Ken scored extremely well on his entrance exams into the military. His scores were so good that he was able to get into his first occupational choice, an Air Traffic Controller.

In August of 1987, Ken entered into Basic Military Training in San Antonio, Texas. Following that, Ken was sent to Biloxi, Mississippi for four months of Air Traffic Control training. This was an intensive school but one in which he excelled. He graduated from the school in March of 1988, and then flew home and was married two days later to his high school sweetheart. He and his wife then left for his first duty assignment at Pease AFB in Portsmouth, New Hampshire.

The training to become a fully qualified controller took about a year. Ken applied himself, worked very hard and was able to complete it in about 10 months. The stresses of the job were extreme but he loved it. He was nominated and selected as Air Traffic Controller of the Quarter a number of times as well as Airmen of the Quarter in his squadron.

Ken began taking college courses on the base and after a few months met with career counselors on base. They were impressed with both his professional and academic achievements and recommended that he pursue a career in the Air Force as an officer and to apply to the ROTC detachment at the University of New Hampshire to seek a commission. He received stellar recommendations from his squadron commander and other supervisors to the detachment.

Ken decided to become an Air Force pilot. Flying had always been a passion of his and to have the opportunity to do it as a career for the military was beyond belief. For him it was a dream came true. The ROTC detachment believed that his scores were so good that he would have no problem obtaining a pilot slot when his application package was sent before the selection board at Headquarters ROTC. However, shortly before his package was to be sent before the board, Congress and the President began making severe cuts in military spending. This affected not only training but also the number of pilots they would keep actively flying. Since there were so many pilot trainees in the pipeline, they had to cut 500 pilot slots from people who were already selected or in the program. Ken's application package was thus never submitted. He was offered to submit his package with another career choice, but decided that as an Air Traffic Controller, he had the second best job in the Air Force.

Nonetheless, Ken found this to be a sharp blow to his psyche. He went into a bit of a depressed state. He was, at the time, taking flying lessons at a local airport to obtain his private pilots license. After the loss of the ROTC slot, he stopped taking flying lessons. Shortly after, he discontinued taking college courses. He and his wife found themselves having difficulties in their marriage to the point where they separated for a brief period of time.

Shortly thereafter it was announced that Pease AFB had been selected by the Base Realignment Commission to be closed. Ken was offered the choice of separating from the Air Force earlier than his four year enlistment, or extending his enlistment and taking another assignment. The year was 1990, and U.S. troops were just beginning to deploy to Saudi Arabia for Desert Shield. He elected to stay in the military and volunteered to be deployed overseas by taking an assignment with a combat communications unit based in Florida.

He was deployed to Kuwait from August 1990 until March 1993, where he was awarded medals, service awards and service ribbons.

Upon returning to North Carolina from Saudi Arabia, Ken began working regularly as an Air Traffic Controller and also taking college courses again. In August of 1992, his home unit in Florida recalled him and he deployed to Homestead AFB, Florida following its destruction from Hurricane Andrew. When he returned from Florida, he had to make a decision as to whether he would re-enlist or separate from the military since the end of his enlistment was approaching.

He began by applying to the Federal Aviation Administration to work as a civilian air traffic controller. Unfortunately, he could not even schedule a testing date as the FAA had a hiring freeze for controllers. This was yet another in a series of disappointments for Ken. The fact that he was not going to be able to get into the FAA due to a hiring freeze was demoralizing. He decided that although he loved his job as a controller, he did not want to stay in North Carolina so he elected to separate from the military. Prior to his separation, he applied to Mary Washington College in Fredericksburg, Virginia and was accepted for the fall semester.

When he returned to Virginia he took a summer job working with the U.S. Department of Justice as an in-house courier. His wife had left North Carolina early to find employment and was becoming established in her job. They bought their first home in Stafford, Virginia and shortly after he began fall classes at Mary Washington.

Ken was pursuing a general liberal arts degree through a program for continuing education students. He became very interested in politics so his intent was to concentrate a lot of his studies in this area. He began attending the College Republican meetings on campus and soon found himself being elected as its President.

The contacts he made as President of the College Republicans helped Ken obtain a job at Baker and Botts and thereafter with numerous political candidates in Virginia. After several campaigns Ken left the political world and began working administrative jobs through a temporary agency. In March of 1996, his son, Connor, was born. His wife stayed home the first three months with him and since Ken was only working a temporary job, he stayed home the next couple months. Eventually Ken landed a job with Lockheed Martin at their Washington office in Crystal City. He was assisting the new PAC manager there who was trying to straighten out their PAC records as well as implement a new software system that would streamline their PAC's operations.

Ken worked at Lockheed Martin for a number of months but was recruited by and eventually hired to be a field coordinator by Jerry Kilgore who was running for Attorney General in Virginia.

He left Lockheed Martin to begin working on the campaign, but two weeks later, his former boss at Lockheed asked if he would be interested in her job as the PAC Manager. He accepted and left the campaign. Eventually Ken was hired on a permanent employee but at a significantly lower salary than the previous person in this position. While he enjoyed the work that he did and the people he worked with, and even though he received raises and promotions over the years, by starting at such a mediocre pay level, it was always difficult financially. He made about one half the salary of most of the other professionals who were close to his age. It was during this time that Mr. Phelps began to write checks to himself. (The reasons and surrounding circumstances will be discussed *infra.*)

After being caught writing checks to himself and leaving Lockheed, Ken did not work for nearly a year and a half. He was in a deep state of depression and basically stayed in his house.

He eventually got a job bartending at Cheeseburger in Paradise. His managing partner asked him to consider going into their management program but since he needed every other weekend off for visitation with his children, the hours of a restaurant manager were not workable. They then asked him to become a part time Key, which is a front of house manager, but without the opening and closing responsibilities.

Concurrently with working at Cheeseburger, Ken obtained his Virginia Real Estate license. After passing the state and national exam, he waited about six months before signing on with Jobin Realty. As a new agent, this was not the best move on his part. It was a relatively small firm with minimal training offered. He spent about six months associated with that firm before transferring to Weichert Realtors. Although the commission rate was lower for agents than at Jobin, Weichert was a much larger company that offered a significant amount of training and mentorship.

The problem Ken encountered with real estate was the start-up costs with establishing his own business. There were numerous association fees, memberships, supplies, advertising costs and other miscellaneous expenses that all needed to be paid for on the front end. Without selling any homes or having any listings, these fees all needed to come out of pocket. Since he was only working as a bartender and had child support obligations, he found it untenable. Ken eventually stopped working there due to the fact that he could not afford it. The real estate market in the area had steeply declined so the chances that he would have any clients in the near term were slim. Nonetheless Ken remains employed at Cheeseburger in Paradise where he is described as an extraordinary employee who is a huge asset to the company.

III. MR. PHELPS' FAMILY LIFE

As we mentioned earlier, Mr. Phelps, at age 18, married his childhood sweetheart. Although they recognized at the time that they were very young to get married, they refused to believe they could not overcome the inevitable obstacles they would encounter.

After seven years of marriage they were close to separating and divorcing. They decided to attempt to work out the differences and begin a family. Their first child, Connor, was born in March of 1996. It was a trying experience for both with a new child, a mortgage, two car payments and not a lot of income. After Mr. Phelps was hired by Lockheed Martin on a full time basis, their second child, Lauren, was born in August of 1997. Not long thereafter a third, and totally unexpected child, Madison, was born. This brought quite a bit of stress as they had just moved into a slightly larger house to accommodate the other two children and felt that they had finished having children. Within two months of Madison being born, Ms. Phelps informed Ken that she did not wish to continue with the marriage. She mainly complained that Mr. Phelps did not make enough money to support them in the manner she wished for them to be supported, and cited one failure after another that Ken had endured along the years. Ken was shocked and devastated. His whole world had been pulled out from under him. He felt he had lost everything - his marriage, his children and his home. He moved into his mother's house and placed all of his personal belongings into storage. He was financially strapped and was soon paying nearly $2,000.00 per month in child support.

Through all this, Mr. Phelps believes that his relationship with his children is solid. To him they are the most wonderful and most important things in his life. After what seems to Ken like a lifetime of disappointments and failures he believes they are the one thing he did right. In

a letter written to this counsel Ken discusses his children by stating: "they bring me such happiness when I'm around and I love to talk to them to find out what and how they're doing in school. Connor is a very athletic boy who plays baseball, football and basketball. He is also quite talented academically. He is in accelerated classes and his teachers have approached us previously about moving him ahead a year in school. My two daughters are the most beautiful girls I've ever laid eyes upon. My older daughter is a caring, kind and considerate person. My youngest is turning out to be a female version of my son, very athletic and very smart. While they bring so much joy and happiness to my life it is bittersweet. I miss not being able to see them grow each and every day. I miss not being able to sit around the dinner table at night and find out each and everything that happened to them that day. I miss not being able to take them to sports practices or help them with homework after school. I miss not having the teaching moments with them… those seemingly unremarkable times when you impart something to your children that they keep with them forever."

The love that Ken Phelps has for his children runs deep and the circumstances in which he now finds himself has plunged him deeper into the depression that he has suffered for years. Even though his wife remarried, Mr. Phelps was responsible for child support payments. Those payments were based upon his salary while at Lockheed Martin and working as a bartender he was unable to make those payments. He fell into arrears and not only conceded custody of his children to his wife and her new husband, but watched as the new husband officially had the children's last name changed to his own. Mr. Phelps describes this as one of the most painful things he has ever had to endure because he knows that he now has no say in their lives and feels like he has been pushed to the periphery.

ARGUMENT

In determining Mr. Phelps' sentence, this court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as the need for the sentence imposed to (1) "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (2) "afford adequate deterrence to criminal conduct" and (3) "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(a)(2)(C). In support of his argument with regard to the relevant considerations, Mr. Phelps offers the following.

I. NATURE AND CIRCUMSTANCES OF THE OFFENSE

The presentence report prepared by Renee Moses-Gregory, as well as the Indictment filed by the Government, describes the criminal activity of Mr. Phelps. On its face, it would appear that Mr. Phelps engaged in a much more elaborate scheme than what was really present. A short and not so sweet version of events is very simple. Mr. Phelps, in an effort to dig out of the financial hole he was in, and in an effort, he believed, to save his struggling marriage, wrote check after check to himself. While he changed the computer notations at Lockheed Martin to disguise that he was the payee of the checks, he knew that it was only a matter of time before he would be discovered because he knew that Lockheed's PAC was required to make periodic reports to the Federal Election Commission concerning each and every contribution made to a federal political candidate or campaign.

Many around Mr. Phelps now believe that he actually wanted to be caught. He was in a deep state of depression and seemingly had nowhere to turn. As wrong and as illegal as Mr. Phelps' actions were, it would appear from his job performance ratings, those who knew him,

and those who worked with him, that his actions did not detract from the stellar work performance he exhibited.

In considering the "nature and circumstances of the offense" under § 3553(a)(1), we urge the Court to recognize the offense for what it truly was. It was wrong. It was illegal. It was the result of a man writing checks to himself, thinking in his depressed state, that it might somehow help keep his family together.

II. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

We realize that we have presented a fairly elaborate history of Mr. Phelps. This 38 year old offender, aside from a driving under the influence charge, has had a clean record. He has worked hard and tried to support a family. He served his country, and was awarded numerous medals and ribbons for distinguished service during both Operation Desert Shield and Desert Storm, where he was deployed as an air traffic controller in combat.

To Mr. Phelps' credit, he has been able to function in life even though it appears from discussions with his family members and recently with doctors who have treated him, that he has not only suffered from depression for quite some time but he also suffered from attention deficit disorder since an early age. Mr. Phelps describes his ADD/Depression as follows:

> When my wife and I split up, I tried to convince her to come with me to the clinic for marriage counseling but she refused. I continued to see Vaughn [his therapist] for therapy. Through tests I took at the clinic, I learned that I have a very strong case of ADD. I had suspected this a few months earlier and purchased a book entitled Driven to Distraction. I cried when I read the book because it made me realize what was going on with me my entire life. Why I had difficulty staying focused in school and thus was a mediocre student. Why I could not finish projects, why I procrastinated as badly as I did. Why I had so many problems in relationships. Why I felt depressed because of these things.
>
> At the clinic they prescribed me not only anti-depressants, but also Ritalin for the ADD. The Ritalin was amazing. It helped me focus

> like a laser beam and think clearly for the first time in dozens of years. Unfortunately after losing my medical benefits when I left Lockheed Martin, I have been uninsured and unable to continue my therapy and get coverage for the prescriptions that I believe were very helpful.
>
> Since I left Lockheed Martin and went into a deeper depression, I have found myself drinking quite a bit more. Not necessarily to excess, but certainly more frequently. I believe this has been more of a self-medication attempt. I likely use the alcohol to relieve the stress of the situation that I'm in currently. I received a DUI last year and have since not driven. I should have received a restricted license but have not done anything to pursue it.
>
> I really feel like my life is in a horrible place at this point. Where once I felt that there was promise and a good future ahead of me, I now feel that I am only treading water. I have never really felt suicidal but there is not much in my life that I have to look forward to. I am scared about what the future holds in this case and petrified to the point of inaction.

There is no question that Mr. Phelps' conduct in this case has been brought on by his marital problems, depression and erroneous belief that money could solve his problems. Mr. Phelps can become, once again, a productive member of our community if he can receive proper counseling. As the Court can see from Mr. Phelps' own statements he has been devastated by these charges and is trying desperately to right the wrong that he has caused.

## III. THE NEED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

Again, we submit that Mr. Phelps' long history of employment, devotion to family, lack of criminal history, along with the fact that he admitted his guilt early on, has had to resign from his job, forfeited his leave to assist in restitution, will suffer the consequences of being a convicted felon, will have to continue to work for many years to make restitution, are all sufficient punishment to reflect the seriousness of his involvement in this offense and to promote

respect for the law. We respectfully submit that a lengthy period of incarceration is not necessary to satisfy any of the objectives of § 3553.

IV. THE NEED TO AFFORD ADEQUATE DETTERRENCE TO CRIMINAL CONDUCT

We submit the same factors listed above to promote respect of the law and to provide just punishment also afford adequate deterrence to criminal conduct. Clearly Mr. Phelps has been deterred. The shame and humiliation he feels, even if there were no other consequences, would serve to deter him. A felony conviction, loss of his job and all the matters associated with his job, such as health insurance, pension, etc., and overall public humiliation are enough, given the facts of this case, to deter criminal conduct by others. In fact, most people in a situation such as Mr. Phelps will be more deterred by the fact of being caught and publicly "hung out to dry" than by the prospect of spending a couple of years in jail.

V. THE NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES

There can be no real dispute that there is no need for a lengthy period of incarceration in this case to protect the public from future crimes by Mr. Phelps. Mr. Phelps arrest and his involvement in the criminal justice system, along with the loss of job, felony conviction and attendant consequences, is more than sufficient to ensure that Mr. Phelps will never again make a bad decision with respect to any illegal conduct. This has been a hard learned lesson for Mr. Phelps. The public needs no protection from him. Since his arrest, he has cooperated with the government in every aspect, and been truthful with government agents and the probation office.

CONCLUSION

The advisory sentencing guideline range in this case, based on a criminal history I, with a total offense level of 16, is a range of imprisonment of 21 to 27 months. We respectfully submit

that a sentence within this range is simply not warranted for this offender and this case. Mr. Phelps has been broken, beaten and battered. At almost every turn of his life he has met with misfortune. Yet, through it all, he has continued in his attempts to work hard and provide for his family. Battling through attention deficit disorder, undiagnosed for many years, and severe bouts of depression, still has been able to serve his country and be recognized as an exemplary employee whether working at a white collar job or flipping hamburgers.

Ken Phelps is truly regretful of his actions. He is remorseful and he is sorry and he suffers humiliation and despair knowing that he has let down his family and his friends but more than all of this Ken Phelps knows that in one way or another his actions have caused him to not only lose his children but to have had his very name stricken from them.

If the Court feels that the crime simply must be punished then we urge the Court to order 12 months of home detention during which time Mr. Phelps can begin to make restitution and, through the Probation Office, begin treatment for his mental problems. We also urge the Court to consider a large number of hours of community service. This crime was not a crime driven by greed, it was a crime of desperation by a man clearly not thinking of the consequences to himself, but simply willing to risk all to keep his family together. We urge the Court to find a solution short of incarceration in a federal prison as a just resolution in this case.

Respectfully submitted,

/s/

G. ALLEN DALE
Bar No. 954 537
601 Pennsylvania Avenue, N.W.
North Building - 9th Floor
Washington, D.C. 20004-2601
(202) 638-2900
Facsimile: (202) 783-1654